Austin R. Freundlich, Esquire (I.D. # 205670)
Gregory C. Littman, Esquire (I.D. # 306806)
Justin F. Robinette, Esquire (I.D. # 319829)

Freundlich & Littman, LLC
1425 Walnut Street, Suite 200
Philadelphia, PA 19102
Tel:  (215) 545-8500
Fax:  (215) 545-8510
justin@fandllaw.com                              *Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREY BROWNSON,<br>    Plaintiff,<br><br>    v.<br><br>PENNSYLVANIA STATE<br>UNIVERSITY,<br>    Defendant | 4:21-CV-01993<br><br>JURY TRIAL DEMANDED |

## <u>FIRST AMENDED COMPLAINT</u>

### THE PARTIES

1.    Plaintiff Frey Brownson ("Dr. Brownson") lives in State College, PA and is

a former Associate Professor in the College of Earth and Mineral Sciences at

Defendant Pennsylvania State University.

2.     Defendant Pennsylvania State University (hereinafter "Penn State") is a state
       related institution of higher education located at 201 Old Main, University
       Park, Pennsylvania 16802.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over the parties and claims pled herein pursuant
       to 28 U.S.C. § 1331.

4.     This Court has supplemental jurisdiction over related state law claims pled
       herein pursuant to 28 U.S.C. § 1367(a).

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C.
       §2000e-5(f)(3).

## EEOC PROCEEDINGS

6.     Dr. Brownson filed charges of sex and disability discrimination with the
       Equal Employment Opportunity Commission ("EEOC") docketed
       September 30, 2020.

7.     The EEOC issued a Right to Sue letter to the Plaintiff dated April 5, 2021,
       and this lawsuit is brought within ninety (90) days of the receipt of the Right
       to Sue letter.

**PERTINENT FEDERAL STATUTES AND REGULATIONS**

**Title VII**

8.   Congress prohibited sex discrimination by employers in Title VII of the
     Civil Rights Act of 1964: "(a) Employer practices. It shall be an unlawful
     employment practice for an employer —  (1) to fail or refuse to hire or to
     discharge any individual, or otherwise to discriminate against any individual
     with respect to his compensation, terms, conditions, or privileges of
     employment, because of such individual's race, color, religion, sex, or
     nationalorigin; or (2) to limit, segregate, or classify his employees or
     applicants for employment in any way which would deprive or tend to
     deprive any individualof employment opportunities or otherwise adversely
     affect his status as an employee, because of such individual's race, color,
     religion, sex, or national origin."  42 U.S.C. § 2000e.

**The Americans with Disabilities Act**

*Title I*

9.   Congress prohibited discrimination against people with disabilities by
     employers in Title I of the ADA: "No covered entity shall discriminate
     against aqualified individual on the basis of disability in regard to job
     application procedures, the hiring, advancement, or discharge of employees,

3

employee compensation, job training, and other terms,conditions, and
privileges of employment. 42 U.S.C. § 12112."

*Title II*

10.   Congress prohibited discrimination against people with disabilities by public
entities in Title II of the ADA: "[N]o qualified individual with a disability
shall, by reason of such disability, be excluded from participation in or be
denied the benefits of the services, programs, or activities of a public entity,
or be subjected to discrimination by any such entity."  42 U.S.C. § 12132; 28
C.F.R. §35.130(a).

**The Rehabilitation Act**

11.   Congress prohibited discrimination against people with disabilities by public
accommodations, and/or the persons associated with their operation, in the
Rehabilitation Act:  "No otherwise qualified individual with a disability in
the United States, as defined in section 705(20) ["Individual with a
Disability"] of this title, shall, solely by reason of her or his disability, be
excluded from the participation in, be denied the benefits of, or be subjected
to discrimination under any program or activity receiving Federal financial
assistance."  29 U.S.C. § 794(a).

## BACKGROUND

12.  Dr. Brownson is transgender ("trans").

13.  Trans is likely due to brain neuroanatomy and the formation of that brain neuroanatomy in the womb.

14.  As noted by Dr. Robert Sapolsky, professor of neuroscience at Stanford University and one of the leading scholars of trans science: "[I]t's not the case that transgender individuals think they're a different gender than they actually are.  It's more like they got stuck with bodies of a different sex from who they actually are." Sapolsky, R.M., Behave, 216 n. (Penguin 2017.)

15.  Dr. Brownson's gender is fundamental and an immutable characteristic.

## Dr. Brownson Has GD

16.  Trans people are often treated as outcasts, and are mocked, harassed, abused, and hurt by others which causes distress in trans people and leads to Gender Dysphoria ("GD").

17.  GD is a medical and therapeutic diagnosis "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning" for the trans person.  *Diagnostic and Statistical Manual of Mental Disorders*, 5th Ed. ("DSM-V" at 302.85).

18.  Trans people are diagnosed as suffering from GD when they have "clinically

significant distress" associated with being trans.

19. GD is a disability in that it substantially impairs one or more major life activities, including, but not limited to, neurological, brain, social, and occupational functions.

20. Dr. Brownson is a trans person who has been diagnosed with GD.

21. Dr. Brownson belongs to the disadvantaged class of trans people with GD.

22. Dr. Brownson is a person with a disability within the definitions of the ADA and the Rehabilitation Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

23. Defendant is aware that trans people with GD, including Dr. Brownson, may be a person with a disability as a result of their GD.

**Defendant Has Discriminated Against Dr. Brownson**

24. Defendant has discriminated against Dr. Brownson on the basis of Dr. Brownson's gender and on the basis of Dr. Brownson's disability by, *inter alia*, denying tenure to Dr. Brownson.

25.  Similarly situated faculty outside of those protected classes were treated more favorably than Dr. Brownson and granted tenure and promotion.

26.  Penn State's justifications for the denial of tenure and promotion are false

and a pretext for discrimination.

27.    As a result of the discrimination, Dr. Brownson has suffered financial and

compensatory damages.

28.    Penn State falsely and pretextually destroyed Dr. Brownson's career.

### Dr. Brownson Academic Achievements

29.    Dr. Brownson has a Bachelor of Science (B.Sc.) in Geology from the

University of North Dakota.

30.    Dr. Brownson has a Masters of Science (M.S.) in Geology from the

Universityof Wisconsin—Madison.

31.    Dr. Brownson has a Doctorate (Ph.D.) in Environmental Science &

Technology from the University of Wisconsin—Madison.

32.    Dr. Brownson was a Postdoctoral Research Scientist at CNRS: Institut de

Chimie et Matériaux de Paris-Est.

33.    Dr. Brownson was a Postdoctoral Research Scientist at the University of

Wisconsin.

34.    Dr. Brownson joined the Graduate Faculty at Penn State in 2007 as an

assistant professor, in the John and Willie Leone Family Department of

Energy and Mineral Engineering.

35.    Dr. Brownson became an associate professor in 2013 also in the John and

Willie Leone Family Department of Energy and Mineral Engineering.

36.    Dr. Brownson was the only member of the Solar engineering faculty at Penn State, and was the Director of the Solar Ecology Program.

37.    Dr. Brownson had published 31 papers in refereed journals, 10 as first author, as well as a book, with two more books in progress.

38.    Dr. Brownson had advised six doctoral students and ten masters students.

39.    Dr. Brownson directed and facilitated the collective works of the Solar Collaborative at Penn State, including students, faculty and staff. The Solar Collaborative pursued laboratory, computational, and field research for solar energy interests, largely aligned with solar photovoltaics as they are currentlybeing deployed in society.

40.    Dr. Brownson had pioneered Penn State's 500 acre solar photovoltaic farm, with groundbreaking in September 2019. Currently under construction, it willbe the largest in PA to date. The farm will contribute a $14 million savings in energy costs for Penn State, and will yield decades of educational and researchopportunities throughout Penn State.  This farm is an outcome of Dr. Brownson's extensive research, their teaching efforts in solar design andstakeholder engagement to over 1000 students, and their service creating sustainability and solar degree programs while at Penn State University.

**Dr. Brownson is Denied Tenure**

41.   On March 25, 2020 Dr. Brownson received notice they were being denied

tenure as they was purportedly weak in research.

42.   The reason for denying Dr. Brownson tenure is entirely pretextual.  Others

who began at the same time have done far less yet have been granted tenure.

43.   For example, out of eight candidates who began at the same time as Dr.

Brownson in 2007, seven were granted tenure. (The one that wasn't, Dr.

Chen, sued Penn State for racial discrimination.)

44.   For example, two of the seven, Drs. Forest and LaFemina, had only one

first-authored paper in their dossiers. Dr. Forest's research activities,

however, were uniformly praised by the college-level reviewers, and Dr.

LaFemina's record was explained away in the grant.

45.   For example, Dr. Forest, was "noted" for his advising record, yet he

completedonly two masters students.

46.   For example, none of Dr. Blumsack's publications are in journals that would

beconsidered first, second, or perhaps even third tier, according to a

reviewer.

47.   The Dean himself is responsible for inconsistent and incoherent statements,

on the one hand failing to recommend tenure for Dr. Brownson in February

2020, on the other writing to Dr. Brownson on July 30, 2020 that "Frey, I very much appreciate your leadership in the Solar Collaborative; I know your work will have a lasting impact on Penn State."

48.  In fact Penn State's Faculty Tenure Rates report dated March 2021, has no category for any trans people being granted tenure.  Available at https://opair.psu.edu/files/2019/05/Tenure-Flow-2011-2012-and-2013-20210318.pdf

49.  Dr. Brownson's contributions to Penn State, in the Dean's words, "will have a lasting impact" on Penn State.

50.  Penn State's failure to grant tenure and the reasons given were entirely pretextual. They demonstrate different treatment of Dr. Brownson to the comparators and are inconsistent and incoherent.

51.  The denial of tenure meant that Penn State had terminated Dr. Brownson's career at Penn State.

52.  Penn State's actions have damaged Dr. Brownson's life and career.

53.   Penn State acted with malice and/or reckless indifference, including but not limited to acting with transphobic hatred.

54.  Penn State is aware that trans people with GD, including Dr. Brownson, may be a person with a disability as a result of their GD.

55.   Dr. Brownson could have been reasonably accommodated but for Penn

State's lack of good faith.

## SUPPLEMENTAL AVERMENTS

56.   Plaintiff was able to perform the essential functions of their job with

reasonable accommodations — being treated consistent with their gender

identity, being referred to with the preferred pronouns "they," "them," and

"theirs," and access to a restroom that was not a male restroom which

request was not addressed.

57.   Regarding Plaintiff's gender dysphoria ("GD") disability, Plaintiff sought to

be treated consistent with their gender identity, to be referred to with the

preferred pronouns "they," "them," and "theirs," and access a restroom that

was not a male restroom which request was not addressed.

58.   The male restroom on the floor of Plaintiff's office building was used by

Plaintiff's male colleagues, and also the Plaintiff's own male students.  The

experience was humiliating when Plaintiff was required to use the male

restroom.  Plaintiff wanted to use a restroom that was consistent with their

gender identity.

59.   Plaintiff submitted a formal request alerting Defendant to discrimination,

attached hereto as Exhibit "A," and, within it, Plaintiff identified that they

felt uncomfortable using a male restroom.  Plaintiff identified to Carmen
Mendoza, a representative of Defendant's Affirmative Action Office, that
there were, Plaintiff believed, one or two Americans with Disabilities Act
("ADA"), or disabled, bathrooms.  See Formal Request, E-mail
Correspondence dated September 27, 2019, attached hereto as Exhibit "A."
Plaintiff stated, *inter alia*:  "I am trapped with the time in every day spent
trying to arrive at work as my authentic self, combined with the systemic
fear of abuse as I am required to enter the male bathrooms in every EMS
[Earth and Mineral Sciences] building (no gender neutral bathrooms, only 1-
2 ADA [Americans with Disabilities Act] bathrooms)."  See Plaintiff's
Formal Request, E-mail Correspondence dated September 27, 2019, at Ex.
"A," p. 2.  Plaintiff identified themselves in the e-mail as a "trans person."
See id.  There was no specific response to the restroom issue in writing or
verbally by Ms. Mendoza or any other representative of the Affirmative
Action Office.

60.   Another colleague happened to tell Plaintiff about the existence of ADA
restrooms, and not any representative of Defendant's Affirmative Action
Office, not any member of Defendant's upper management, not a supervisor,
and not an employee of the HR department.

61.   Plaintiff discovered or became aware on their own of <u>one</u> ADA restroom.

62.   This restroom was not even in Plaintiff's building.

63.   Plaintiff had to leave their office, leave their floor, leave their building, and traverse campus in order to use the restroom.

64.   Ms. Mendoza and the Defendant provided no specific response to Plaintiff's concern about access to the restroom.

65.   Ms. Mendoza did state in response to one of Plaintiff's prior e-mails:  "Dear Frey, My heart breaks reading what you're experiencing.  I can understand how that makes you feel.  It is a systemic situation.  What is the solution???"  <u>See</u> E-mail Correspondence from Carmen Mendoza, Affirmative Action Office, to Plaintiff, dated September 25, 2019, at Ex. "A," p. 6.

66.   Defendant did not act to prevent, correct, or remedy the issue Plaintiff raised regarding restroom access.

67.   Neither did Defendant engage in the interactive process to identify an available reasonable accommodation.

68.   Defendant had knowledge of Plaintiff's transgender-related disability.

69.   Defendant failed to accommodate Plaintiff's transgender-related disability.

70.   Plaintiff identified, in or around 2018, in a "Self-Assessment" document, which Defendant asks its employees to provide, and which Plaintiff did

provide to Defendant, stating:

> I self-identify as [a] non-binary person and I work in solar energy, in a sub-field that I created called *solar ecology*. For clarification, being nonbinary, or genderqueer, is a less well know[n] form of transgender self-identification. Used today, *transgender* is also an umbrella term to indicate not identifying with the gender assigned to you at birth. I have never identified as cis-male (assigned male at birth), and neither do I identify as a woman. As a result, in STEM environments of work, I often experience a social dysphoria and fear of revealing my identity. Every day at Penn State until late 2018 had been an energy intensive effort to mask my presentation of self, to present[,] in essence, in 'drag' as straight, masculine, cis-male. I believe my 2019 transition to identify openly as a transgender non-binary person and as [a] queer solar expert was essential to effect profound change for my professional future.

See Plaintiff's Self-Assessment, dated 2018, p. 1. Plaintiff's Self-Assessment also supplies Defendant with knowledge of Plaintiff's disability. Plaintiff's Self-Assessment is a document that is integral to and explicitly relied upon in the Complaint.

71.  Plaintiff was also known as being "genderqueer" by various employees to whom Plaintiff told this.

72.  Plaintiff met formally with Lee Kump, Dean of the College of Earth and Mineral Sciences, on or about January 16, 2019. During the meeting, Plaintiff took notes of the discussion. Plaintiff wrote, among other things, " – not realizing I do not identify as a man. [genderqueer]." Plaintiff discussed with Dean Kump during the meeting that Plaintiff identified as

14

"genderqueer."  See Plaintiff's Meeting Notes, dated January 16, 2019, at p. 1.  Plaintiff's meeting notes from this date consist of a two-page document that was integral and explicitly relied upon in the Complaint.

73.   Plaintiff was pervasively misgendered which occurred during their employment because the Plaintiff is non-binary and transgender.  This occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

74.   Plaintiff was frequently misgendered for example, by their supervisor/manager, Dr. Sarma Pisupati, with incorrect pronouns ("he," "him," and "his").  This occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

75.   In addition to Plaintiff's supervisor/manager, Dr. Pisupati, frequently misgendering Plaintiff, Russell Johns frequently misgendered Plaintiff including with incorrect pronouns.  Russell Johns is the George E. Trimble Chair of Energy and Mineral Sciences, was also on the Plaintiff's Tenure Review Committee, and was involved in the decision-making to deny the Plaintiff tenure.  The misgendering by Russell Johns occurred after Plaintiff

identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

76.     In addition to Plaintiff's supervisor/manager, Dr. Pisupati, and Russell Johns, Chair of the Department and of the Tenure Review Committee, frequently misgendering Plaintiff, Plaintiff was also frequently misgendered during their employment, with incorrect pronouns, by:  Jonathan Mathews, Professor, who acted as the supervisor/manager in lieu of Dr. Pisupati for a period of time; Chunshan Song, Director of the Energy Institute; Turgay Ertekin, Professor Emeritus, who acted as the Department Head for a period of time; Ljubisa Radovic, Professor of Energy and Mineral Engineering; and Andy Kleit, Professor of Energy and Environmental Economics.  Plaintiff was misgendered despite identifying that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

77.     Dr. Pisupati also regularly used comments that were not consistent with Plaintiff's gender identity, such as "guy" and "young man," to refer to Plaintiff, in Plaintiff's presence, and also in the presence of other employees. This also occurred after Plaintiff identified that they wanted to be treated

consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

78.   Plaintiff eventually indicated to Dr. Pisupati that Plaintiff wanted to be called "Frey" which is a gender-neutral form of the male name, "Jeffrey." Dr. Pisupati conspicuously avoided using the Plaintiff's first name entirely, Plaintiff contends, because the Plaintiff is non-binary and transgender.

79.   The supervisor/manager, Dr. Pisupati, called other male employees by their first names.

80.   The supervisor/manager, Dr. Pisupati, actively avoided the Plaintiff, and not the cisgender male employees in the office.  This made it more difficult for the Plaintiff to do the job because being able to interact or communicate with one's supervisor including to receive direction is an essential function of the job, and constitutes control with respect to the employment relationship, to which all of the other employees under Dr. Pisupati were subject.  Dr. Pisupati actively avoided Plaintiff because Plaintiff is transgender and non-binary, electing to interact with the Plaintiff, and to address the Plaintiff, on rare occasions, if at all.

81.   When it appeared Dr. Pisupati was being required to interact with the Plaintiff, which was rare, Dr. Pisupati addressed the Plaintiff overly

formally, with "Dr. Brownson," or "Doctor," in order to avoid using the Plaintiff's preferred first name, "Frey"—which is different than how Dr. Pisupati referred to and treated the cisgender male employees in the office whom he referred to by their first names, and with Plaintiff's further requests to be treated consistent with their gender identity not honored by Dr. Pisupati.

## COUNT I – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT SEX DISCRIMINATION

82. Dr. Brownson restates and realleges all previous paragraphs as though fully setforth here.

83. Dr. Brownson's gender means they are in a protected class.

84. Dr. Brownson was qualified for their position and able to perform the essentialfunctions.

85. Penn State created a hostile environment and terminated Dr. Brownson from their position because of their gender and replaced them by someone who is nottrans.

86. Penn State's conduct was severe and/or pervasive, created a hostile or abusiveworking environment, was unwelcome, and was based on Dr. Brownson's gender.

87.   Dr. Brownson suffered adverse employment actions, including but not limited to, being denied promotion and tenure.

88.   Circumstances exist giving rise to the inference that Dr. Brownson was deniedtenure and promotion because of their sex including, but not limited to, that similarly situated non trans employees with similar or less favorable performance than Dr. Brownson were awarded tenure and promotion.

89.   Defendant's justifications for its denial of Dr. Brownson's tenure and promotion are false and a pretext for discrimination.

## COUNT II – VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT (43 P.S. §§ 951-963) SEX DISCRIMINATION

90.   Dr. Brownson restates and realleges all previous paragraphs as though fully set forth here.

91.   Dr. Brownson's gender means they are in a protected class under the PHRA.

92.   Dr. Brownson was qualified for their position and able to perform the essential functions.

93.   Penn State created a hostile environment and terminated Dr. Brownson from their position because of their gender and replaced them by someone who is not trans.

94.   Penn State's conduct was severe and/or pervasive, created a hostile or

abusive working environment, was unwelcome, and was based on Dr. Brownson's gender.

95. Dr. Brownson suffered adverse employment actions, including but not limited to, being denied promotion and tenure.

96. Circumstances exist giving rise to the inference that Dr. Brownson was deniedtenure and promotion because of their sex including, but not limited to, that similarly situated non trans employees with similar or less favorable performance than Dr. Brownson were awarded tenure and promotion.

97. Defendant's justifications for its denial of Dr. Brownson's tenure and promotion are false and a pretext for discrimination.

## COUNT III – VIOLATION OF TITLE I OF THE ADA

98. Dr. Brownson restates and realleges all previous paragraphs as though fully setforth here.

99. Dr. Brownson's has a disability – GD – within the meaning of the ADA.

100. Dr. Brownson is a "qualified individual" able to perform the essential functions of their position.

101. Plaintiff was able to perform the essential functions of their job with reasonable accommodations — being treated consistent with their gender identity, being referred to with the preferred pronouns "they," "them," and

"theirs," and access to a restroom that was not a male restroom which request was not addressed.

102. Regarding Plaintiff's gender dysphoria ("GD") disability, Plaintiff sought to be treated consistent with their gender identity, to be referred to with the preferred pronouns "they," "them," and "theirs," and access a restroom that was not a male restroom which request was not addressed.

103. The male restroom on the floor of Plaintiff's office building was used by Plaintiff's male colleagues, and also the Plaintiff's own male students.  The experience was humiliating when Plaintiff was required to use the male restroom.  Plaintiff wanted to use a restroom that was consistent with their gender identity.

104. Plaintiff submitted a formal request alerting Defendant to discrimination, attached hereto as Exhibit "A," and, within it, Plaintiff identified that they felt uncomfortable using a male restroom.  Plaintiff identified to Carmen Mendoza, a representative of Defendant's Affirmative Action Office, that there were, Plaintiff believed, one or two Americans with Disabilities Act ("ADA"), or disabled, bathrooms.  See Formal Request, E-mail Correspondence dated September 27, 2019, attached hereto as Exhibit "A." Plaintiff stated, *inter alia*:  "I am trapped with the time in every day spent

trying to arrive at work as my authentic self, combined with the systemic fear of abuse as I am required to enter the male bathrooms in every EMS [Earth and Mineral Sciences] building (no gender neutral bathrooms, only 1-2 ADA [Americans with Disabilities Act] bathrooms)."  See Plaintiff's Formal Request, E-mail Correspondence dated September 27, 2019, at Ex. "A," p. 2.  Plaintiff identified themselves in the e-mail as a "trans person." See id.  There was no specific response to the restroom issue in writing or verbally by Ms. Mendoza or any other representative of the Affirmative Action Office.

105. Another colleague happened to tell Plaintiff about the existence of ADA restrooms, and not any representative of Defendant's Affirmative Action Office, not any member of Defendant's upper management, not a supervisor, and not an employee of the HR department.

106. Plaintiff discovered or became aware on their own of one ADA restroom.

107. This restroom was not even in Plaintiff's building.

108. Plaintiff had to leave their office, leave their floor, leave their building, and traverse campus in order to use the restroom.

109. Ms. Mendoza and the Defendant provided no specific response to Plaintiff's concern about access to the restroom.

110. Ms. Mendoza did state in response to one of Plaintiff's prior e-mails: "Dear Frey, My heart breaks reading what you're experiencing. I can understand how that makes you feel. It is a systemic situation. What is the solution???" See E-mail Correspondence from Carmen Mendoza, Affirmative Action Office, to Plaintiff, dated September 25, 2019, at Ex. "A," p. 6.

111. Defendant did not act to prevent, correct, or remedy the issue Plaintiff raised regarding restroom access.

112. Neither did Defendant engage in the interactive process to identify an available reasonable accommodation.

113. Defendant had knowledge of Plaintiff's transgender-related disability.

114. Defendant failed to accommodate Plaintiff's transgender-related disability.

115. Plaintiff identified, in or around 2018, in a "Self-Assessment" document, which Defendant asks its employees to provide, and which Plaintiff did provide to Defendant, stating:

> I self-identify as [a] non-binary person and I work in solar energy, in a sub-field that I created called *solar ecology*. For clarification, being nonbinary, or genderqueer, is a less well know[n] form of transgender self-identification. Used today, *transgender* is also an umbrella term to indicate not identifying with the gender assigned to you at birth. I have never identified as cis-male (assigned male at birth), and neither do I identify as a woman. As a result, in STEM environments of work, I often experience a social dysphoria and fear of revealing my identity. Every day at Penn State until late 2018 had been an energy intensive

> effort to mask my presentation of self, to present[,] in essence, in 'drag'
> as straight, masculine, cis-male. I believe my 2019 transition to identify
> openly as a transgender non-binary person and as [a] queer solar expert
> was essential to effect profound change for my professional future.

See Plaintiff's Self-Assessment, dated 2018, p. 1.  Plaintiff's Self-Assessment also

supplies Defendant with knowledge of Plaintiff's disability.  Plaintiff's Self-

Assessment is a document that is integral to and explicitly relied upon in the

Complaint.

116.   Plaintiff was also known as being "genderqueer" by various employees to

whom Plaintiff told this.

117.   Plaintiff met formally with Lee Kump, Dean of the College of Earth and

Mineral Sciences, on or about January 16, 2019.  During the meeting,

Plaintiff took notes of the discussion.  Plaintiff wrote, among other things, "

– not realizing I do not identify as a man. [genderqueer]."  Plaintiff

discussed with Dean Kump during the meeting that Plaintiff identified as

"genderqueer."  See Plaintiff's Meeting Notes, dated January 16, 2019, at p.

1.  Plaintiff's meeting notes from this date consist of a two-page document

that was integral and explicitly relied upon in the Complaint.

118.   Plaintiff was pervasively misgendered which occurred during their

employment because the Plaintiff is non-binary and transgender.  This

occurred after Plaintiff identified that they wanted to be treated consistent

with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

119. Plaintiff was frequently misgendered for example, by their supervisor/manager, Dr. Sarma Pisupati, with incorrect pronouns ("he," "him," and "his"). This occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

120. In addition to Plaintiff's supervisor/manager, Dr. Pisupati, frequently misgendering Plaintiff, Russell Johns frequently misgendered Plaintiff including with incorrect pronouns. Russell Johns is the George E. Trimble Chair of Energy and Mineral Sciences, was also on the Plaintiff's Tenure Review Committee, and was involved in the decision-making to deny the Plaintiff tenure. The misgendering by Russell Johns occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

121. In addition to Plaintiff's supervisor/manager, Dr. Pisupati, and Russell Johns, Chair of the Department and of the Tenure Review Committee, frequently misgendering Plaintiff, Plaintiff was also frequently misgendered

during their employment, with incorrect pronouns, by:  Jonathan Mathews, Professor, who acted as the supervisor/manager in lieu of Dr. Pisupati for a period of time; Chunshan Song, Director of the Energy Institute; Turgay Ertekin, Professor Emeritus, who acted as the Department Head for a period of time; Ljubisa Radovic, Professor of Energy and Mineral Engineering; and Andy Kleit, Professor of Energy and Environmental Economics.  Plaintiff was misgendered despite identifying that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

122. Dr. Pisupati also regularly used comments that were not consistent with Plaintiff's gender identity, such as "guy" and "young man," to refer to Plaintiff, in Plaintiff's presence, and also in the presence of other employees. This also occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

123. Plaintiff eventually indicated to Dr. Pisupati that Plaintiff wanted to be called "Frey" which is a gender-neutral form of the male name, "Jeffrey." Dr. Pisupati conspicuously avoided using the Plaintiff's first name entirely, Plaintiff contends, because the Plaintiff is non-binary and transgender.

124.    The supervisor/manager, Dr. Pisupati, called other male employees by their first names.

125.    The supervisor/manager, Dr. Pisupati, actively avoided the Plaintiff, and not the cisgender male employees in the office.  This made it more difficult for the Plaintiff to do the job because being able to interact or communicate with one's supervisor including to receive direction is an essential function of the job, and constitutes control with respect to the employment relationship, to which all of the other employees under Dr. Pisupati were subject.  Dr. Pisupati actively avoided Plaintiff because Plaintiff is transgender and non-binary, electing to interact with the Plaintiff, and to address the Plaintiff, on rare occasions, if at all.

126.    When it appeared Dr. Pisupati was being required to interact with the Plaintiff, which was rare, Dr. Pisupati addressed the Plaintiff overly formally, with "Dr. Brownson," or "Doctor," in order to avoid using the Plaintiff's preferred first name, "Frey"—which is different than how Dr. Pisupati referred to and treated the cisgender male employees in the office whom he referred to by their first names, and with Plaintiff's further requests to be treated consistent with their gender identity not honored by Dr. Pisupati.

127.   Dr. Brownson's GD was a motivating factor in Penn State's termination.

128.   Penn State acted with deliberate indifference to Dr. Brownson's rights under the ADA.

129.   As a direct result of the aforesaid unlawful discriminatory practices engaged inby Penn State in violation of the ADA, Dr. Brownson has sustained harm.

130.   As a further direct result of the aforesaid unlawful discriminatory practices engaged in by Penn State in violation of the ADA, Dr. Brownson has suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem. Dr. Brownson seeks redress for Penn State's violation of their rights under 42 U.S.C. §12133.

## COUNT IV – VIOLATION OF TITLE II OF THE ADA

131.   Dr. Brownson restates and realleges all previous paragraphs as though fully setforth here.

132.   Dr. Brownson has a disability – GD – within the meaning of the ADA.

133.   Penn State is a public entity within the meaning of the ADA.

134.   Penn State's treatment of Dr. Brownson violates the ADA by discriminating against Dr. Brownson on the basis of their disability.

135.   Plaintiff was able to perform the essential functions of their job with reasonable accommodations — being treated consistent with their gender

identity, being referred to with the preferred pronouns "they," "them," and "theirs," and access to a restroom that was not a male restroom which request was not addressed.

136. Regarding Plaintiff's gender dysphoria ("GD") disability, Plaintiff sought to be treated consistent with their gender identity, to be referred to with the preferred pronouns "they," "them," and "theirs," and access a restroom that was not a male restroom which request was not addressed.

137. The male restroom on the floor of Plaintiff's office building was used by Plaintiff's male colleagues, and also the Plaintiff's own male students. The experience was humiliating when Plaintiff was required to use the male restroom. Plaintiff wanted to use a restroom that was consistent with their gender identity.

138. Plaintiff submitted a formal request alerting Defendant to discrimination, attached hereto as Exhibit "A," and, within it, Plaintiff identified that they felt uncomfortable using a male restroom. Plaintiff identified to Carmen Mendoza, a representative of Defendant's Affirmative Action Office, that there were, Plaintiff believed, one or two Americans with Disabilities Act ("ADA"), or disabled, bathrooms. See Formal Request, E-mail Correspondence dated September 27, 2019, attached hereto as Exhibit "A."

Plaintiff stated, *inter alia*:  "I am trapped with the time in every day spent trying to arrive at work as my authentic self, combined with the systemic fear of abuse as I am required to enter the male bathrooms in every EMS [Earth and Mineral Sciences] building (no gender neutral bathrooms, only 1-2 ADA [Americans with Disabilities Act] bathrooms)."  <u>See</u> Plaintiff's Formal Request, E-mail Correspondence dated September 27, 2019, at Ex. "A," p. 2.  Plaintiff identified themselves in the e-mail as a "trans person." <u>See id.</u>  There was no specific response to the restroom issue in writing or verbally by Ms. Mendoza or any other representative of the Affirmative Action Office.

139.    Another colleague happened to tell Plaintiff about the existence of ADA restrooms, and not any representative of Defendant's Affirmative Action Office, not any member of Defendant's upper management, not a supervisor, and not an employee of the HR department.

140.    Plaintiff discovered or became aware on their own of <u>one</u> ADA restroom.

141.    This restroom was not even in Plaintiff's building.

142.    Plaintiff had to leave their office, leave their floor, leave their building, and traverse campus in order to use the restroom.

143.    Ms. Mendoza and the Defendant provided no specific response to Plaintiff's

concern about access to the restroom.

144. Ms. Mendoza did state in response to one of Plaintiff's prior e-mails: "Dear Frey, My heart breaks reading what you're experiencing. I can understand how that makes you feel. It is a systemic situation. What is the solution???" <u>See</u> E-mail Correspondence from Carmen Mendoza, Affirmative Action Office, to Plaintiff, dated September 25, 2019, at Ex. "A," p. 6.

145. Defendant did not act to prevent, correct, or remedy the issue Plaintiff raised regarding restroom access.

146. Neither did Defendant engage in the interactive process to identify an available reasonable accommodation.

147. Defendant had knowledge of Plaintiff's transgender-related disability.

148. Defendant failed to accommodate Plaintiff's transgender-related disability.

149. Plaintiff identified, in or around 2018, in a "Self-Assessment" document, which Defendant asks its employees to provide, and which Plaintiff did provide to Defendant, stating:

> I self-identify as [a] non-binary person and I work in solar energy, in a sub-field that I created called *solar ecology*. For clarification, being nonbinary, or genderqueer, is a less well know[n] form of transgender self-identification. Used today, *transgender* is also an umbrella term to indicate not identifying with the gender assigned to you at birth. I have never identified as cis-male (assigned male at birth), and neither do I identify as a woman. As a result, in STEM environments of work, I

31

> often experience a social dysphoria and fear of revealing my identity. Every day at Penn State until late 2018 had been an energy intensive effort to mask my presentation of self, to present[,] in essence, in 'drag' as straight, masculine, cis-male. I believe my 2019 transition to identify openly as a transgender non-binary person and as [a] queer solar expert was essential to effect profound change for my professional future.

<u>See</u> Plaintiff's Self-Assessment, dated 2018, p. 1. Plaintiff's Self-Assessment also supplies Defendant with knowledge of Plaintiff's disability. Plaintiff's Self-Assessment is a document that is integral to and explicitly relied upon in the Complaint.

150. Plaintiff was also known as being "genderqueer" by various employees to whom Plaintiff told this.

151. Plaintiff met formally with Lee Kump, Dean of the College of Earth and Mineral Sciences, on or about January 16, 2019. During the meeting, Plaintiff took notes of the discussion. Plaintiff wrote, among other things, " – not realizing <u>I do not identify</u> as a man. [genderqueer]." Plaintiff discussed with Dean Kump during the meeting that Plaintiff identified as "genderqueer." <u>See</u> Plaintiff's Meeting Notes, dated January 16, 2019, at p. 1. Plaintiff's meeting notes from this date consist of a two-page document that was integral and explicitly relied upon in the Complaint.

152. Plaintiff was pervasively misgendered which occurred during their employment because the Plaintiff is non-binary and transgender. This

occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

153.   Plaintiff was frequently misgendered for example, by their supervisor/manager, Dr. Sarma Pisupati, with incorrect pronouns ("he," "him," and "his").  This occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

154.   In addition to Plaintiff's supervisor/manager, Dr. Pisupati, frequently misgendering Plaintiff, Russell Johns frequently misgendered Plaintiff including with incorrect pronouns.  Russell Johns is the George E. Trimble Chair of Energy and Mineral Sciences, was also on the Plaintiff's Tenure Review Committee, and was involved in the decision-making to deny the Plaintiff tenure.  The misgendering by Russell Johns occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

155.   In addition to Plaintiff's supervisor/manager, Dr. Pisupati, and Russell Johns, Chair of the Department and of the Tenure Review Committee,

frequently misgendering Plaintiff, Plaintiff was also frequently misgendered during their employment, with incorrect pronouns, by:  Jonathan Mathews, Professor, who acted as the supervisor/manager in lieu of Dr. Pisupati for a period of time; Chunshan Song, Director of the Energy Institute; Turgay Ertekin, Professor Emeritus, who acted as the Department Head for a period of time; Ljubisa Radovic, Professor of Energy and Mineral Engineering; and Andy Kleit, Professor of Energy and Environmental Economics.  Plaintiff was misgendered despite identifying that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

156.  Dr. Pisupati also regularly used comments that were not consistent with Plaintiff's gender identity, such as "guy" and "young man," to refer to Plaintiff, in Plaintiff's presence, and also in the presence of other employees. This also occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

157.  Plaintiff eventually indicated to Dr. Pisupati that Plaintiff wanted to be called "Frey" which is a gender-neutral form of the male name, "Jeffrey." Dr. Pisupati conspicuously avoided using the Plaintiff's first name entirely,

Plaintiff contends, because the Plaintiff is non-binary and transgender.

158. The supervisor/manager, Dr. Pisupati, called other male employees by their first names.

159. The supervisor/manager, Dr. Pisupati, actively avoided the Plaintiff, and not the cisgender male employees in the office.  This made it more difficult for the Plaintiff to do the job because being able to interact or communicate with one's supervisor including to receive direction is an essential function of the job, and constitutes control with respect to the employment relationship, to which all of the other employees under Dr. Pisupati were subject.  Dr. Pisupati actively avoided Plaintiff because Plaintiff is transgender and non-binary, electing to interact with the Plaintiff, and to address the Plaintiff, on rare occasions, if at all.

160. When it appeared Dr. Pisupati was being required to interact with the Plaintiff, which was rare, Dr. Pisupati addressed the Plaintiff overly formally, with "Dr. Brownson," or "Doctor," in order to avoid using the Plaintiff's preferred first name, "Frey"—which is different than how Dr. Pisupati referred to and treated the cisgender male employees in the office whom he referred to by their first names, and with Plaintiff's further requests to be treated consistent with their gender identity not honored by Dr.

Pisupati.

161. Penn State acted with deliberate indifference to Dr. Brownson's rights under the ADA.

162. As a direct result of the aforesaid unlawful discriminatory practices engaged in by Penn State in violation of the ADA, Dr. Brownson has sustained harm.

## COUNT V – VIOLATION OF THE REHABILITATION ACT

163. Dr. Brownson restates and realleges all previous paragraphs as though fully setforth here.

164. Dr. Brownson is a qualified person with a disability within the meaning of the Rehabilitation Act.

165. Penn State accepts federal financial assistance and has done so at all times relevant to this Complaint and has "program[s] . . . receiving Federal financialassistance" for the purposes of the Rehabilitation Act.

166. Penn State has violated the Rehabilitation Act by discriminating against Dr. Brownson solely on the basis of their disability.

167. Plaintiff was able to perform the essential functions of their job with reasonable accommodations — being treated consistent with their gender identity, being referred to with the preferred pronouns "they," "them," and "theirs," and access to a restroom that was not a male restroom which

request was not addressed.

168.   Regarding Plaintiff's gender dysphoria ("GD") disability, Plaintiff sought to be treated consistent with their gender identity, to be referred to with the preferred pronouns "they," "them," and "theirs," and access a restroom that was not a male restroom which request was not addressed.

169.   The male restroom on the floor of Plaintiff's office building was used by Plaintiff's male colleagues, and also the Plaintiff's own male students.  The experience was humiliating when Plaintiff was required to use the male restroom.  Plaintiff wanted to use a restroom that was consistent with their gender identity.

170.   Plaintiff submitted a formal request alerting Defendant to discrimination, attached hereto as Exhibit "A," and, within it, Plaintiff identified that they felt uncomfortable using a male restroom.  Plaintiff identified to Carmen Mendoza, a representative of Defendant's Affirmative Action Office, that there were, Plaintiff believed, one or two Americans with Disabilities Act ("ADA"), or disabled, bathrooms.  See Formal Request, E-mail Correspondence dated September 27, 2019, attached hereto as Exhibit "A." Plaintiff stated, *inter alia*:  "I am trapped with the time in every day spent trying to arrive at work as my authentic self, combined with the systemic

fear of abuse as I am required to enter the male bathrooms in every EMS [Earth and Mineral Sciences] building (no gender neutral bathrooms, only 1-2 ADA [Americans with Disabilities Act] bathrooms)."  See Plaintiff's Formal Request, E-mail Correspondence dated September 27, 2019, at Ex. "A," p. 2.  Plaintiff identified themselves in the e-mail as a "trans person."  See id.  There was no specific response to the restroom issue in writing or verbally by Ms. Mendoza or any other representative of the Affirmative Action Office.

171.  Another colleague happened to tell Plaintiff about the existence of ADA restrooms, and not any representative of Defendant's Affirmative Action Office, not any member of Defendant's upper management, not a supervisor, and not an employee of the HR department.

172.  Plaintiff discovered or became aware on their own of one ADA restroom.

173.  This restroom was not even in Plaintiff's building.

174.  Plaintiff had to leave their office, leave their floor, leave their building, and traverse campus in order to use the restroom.

175.  Ms. Mendoza and the Defendant provided no specific response to Plaintiff's concern about access to the restroom.

176.  Ms. Mendoza did state in response to one of Plaintiff's prior e-mails:  "Dear

Frey, My heart breaks reading what you're experiencing.  I can understand

how that makes you feel.  It is a systemic situation.  What is the solution???"

<u>See</u> E-mail Correspondence from Carmen Mendoza, Affirmative Action

Office, to Plaintiff, dated September 25, 2019, at Ex. "A," p. 6.

177.   Defendant did not act to prevent, correct, or remedy the issue Plaintiff raised

regarding restroom access.

178.   Neither did Defendant engage in the interactive process to identify an

available reasonable accommodation.

179.   Defendant had knowledge of Plaintiff's transgender-related disability.

180.   Defendant failed to accommodate Plaintiff's transgender-related disability.

181.   Plaintiff identified, in or around 2018, in a "Self-Assessment" document,

which Defendant asks its employees to provide, and which Plaintiff did

provide to Defendant, stating:

> I self-identify as [a] non-binary person and I work in solar energy, in a
> sub-field that I created called *solar ecology*.  For clarification, being
> nonbinary, or genderqueer, is a less well know[n] form of transgender
> self-identification.  Used today, *transgender* is also an umbrella term to
> indicate not identifying with the gender assigned to you at birth.  I have
> never identified as cis-male (assigned male at birth), and neither do I
> identify as a woman.  As a result, in STEM environments of work, I
> often experience a social dysphoria and fear of revealing my identity.
> Every day at Penn State until late 2018 had been an energy intensive
> effort to mask my presentation of self, to present[,] in essence, in 'drag'
> as straight, masculine, cis-male.  I believe my 2019 transition to identify

openly as a transgender non-binary person and as [a] queer solar expert
was essential to effect profound change for my professional future.

See Plaintiff's Self-Assessment, dated 2018, p. 1.  Plaintiff's Self-Assessment also

supplies Defendant with knowledge of Plaintiff's disability.  Plaintiff's Self-

Assessment is a document that is integral to and explicitly relied upon in the

Complaint.

182.   Plaintiff was also known as being "genderqueer" by various employees to

whom Plaintiff told this.

183.   Plaintiff met formally with Lee Kump, Dean of the College of Earth and

Mineral Sciences, on or about January 16, 2019.  During the meeting,

Plaintiff took notes of the discussion.  Plaintiff wrote, among other things, "

– not realizing I do not identify as a man. [genderqueer]."  Plaintiff

discussed with Dean Kump during the meeting that Plaintiff identified as

"genderqueer."  See Plaintiff's Meeting Notes, dated January 16, 2019, at p.

1.  Plaintiff's meeting notes from this date consist of a two-page document

that was integral and explicitly relied upon in the Complaint.

184.   Plaintiff was pervasively misgendered which occurred during their

employment because the Plaintiff is non-binary and transgender.  This

occurred after Plaintiff identified that they wanted to be treated consistent

with their gender identity including by being referred to with the pronouns,

"they," "them," and "theirs."

185. Plaintiff was frequently misgendered for example, by their supervisor/manager, Dr. Sarma Pisupati, with incorrect pronouns ("he," "him," and "his"). This occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

186. In addition to Plaintiff's supervisor/manager, Dr. Pisupati, frequently misgendering Plaintiff, Russell Johns frequently misgendered Plaintiff including with incorrect pronouns. Russell Johns is the George E. Trimble Chair of Energy and Mineral Sciences, was also on the Plaintiff's Tenure Review Committee, and was involved in the decision-making to deny the Plaintiff tenure. The misgendering by Russell Johns occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

187. In addition to Plaintiff's supervisor/manager, Dr. Pisupati, and Russell Johns, Chair of the Department and of the Tenure Review Committee, frequently misgendering Plaintiff, Plaintiff was also frequently misgendered during their employment, with incorrect pronouns, by:  Jonathan Mathews,

Professor, who acted as the supervisor/manager in lieu of Dr. Pisupati for a period of time; Chunshan Song, Director of the Energy Institute; Turgay Ertekin, Professor Emeritus, who acted as the Department Head for a period of time; Ljubisa Radovic, Professor of Energy and Mineral Engineering; and Andy Kleit, Professor of Energy and Environmental Economics.  Plaintiff was misgendered despite identifying that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

188.  Dr. Pisupati also regularly used comments that were not consistent with Plaintiff's gender identity, such as "guy" and "young man," to refer to Plaintiff, in Plaintiff's presence, and also in the presence of other employees. This also occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

189.  Plaintiff eventually indicated to Dr. Pisupati that Plaintiff wanted to be called "Frey" which is a gender-neutral form of the male name, "Jeffrey." Dr. Pisupati conspicuously avoided using the Plaintiff's first name entirely, Plaintiff contends, because the Plaintiff is non-binary and transgender.

190.  The supervisor/manager, Dr. Pisupati, called other male employees by their

first names.

191.   The supervisor/manager, Dr. Pisupati, actively avoided the Plaintiff, and not the cisgender male employees in the office.  This made it more difficult for the Plaintiff to do the job because being able to interact or communicate with one's supervisor including to receive direction is an essential function of the job, and constitutes control with respect to the employment relationship, to which all of the other employees under Dr. Pisupati were subject.  Dr. Pisupati actively avoided Plaintiff because Plaintiff is transgender and non-binary, electing to interact with the Plaintiff, and to address the Plaintiff, on rare occasions, if at all.

192.   When it appeared Dr. Pisupati was being required to interact with the Plaintiff, which was rare, Dr. Pisupati addressed the Plaintiff overly formally, with "Dr. Brownson," or "Doctor," in order to avoid using the Plaintiff's preferred first name, "Frey"—which is different than how Dr. Pisupati referred to and treated the cisgender male employees in the office whom he referred to by their first names, and with Plaintiff's further requests to be treated consistent with their gender identity not honored by Dr. Pisupati.

193.   Penn State's termination of Dr. Brownson violates the Rehabilitation Act and

is done with deliberate indifference.

194.  As a direct result of Penn State's unlawful and discriminatory practices in violation of the Rehabilitation Act, Dr. Brownson has sustained harm.

195.  As a direct result of Penn State's unlawful and discriminatory practices in violation of the Rehabilitation Act, Dr. Brownson has suffered severe emotionaldistress, embarrassment, humiliation, and loss of self-esteem.

196.  Dr. Brownson seeks redress for Defendants' violation of their rights under 29 U.S.C. §794(a).

## COUNT VI – VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT (43 P.S. §§ 951-963) DISABILITY DISCRIMINATION

197.  Dr. Brownson restates and realleges all previous paragraphs as though fully setforth here.

198.  Dr. Brownson is a protected person with a disability within the meaning of the PHRA.

199.  Penn State has violated the PHRA by discriminating against Dr. Brownson solely on the basis of their disability.

200.  Dr. Brownson is a "qualified individual" able to perform the essential functions of their position.

201.  Plaintiff was able to perform the essential functions of their job with

reasonable accommodations — being treated consistent with their gender identity, being referred to with the preferred pronouns "they," "them," and "theirs," and access to a restroom that was not a male restroom which request was not addressed.

202.   Regarding Plaintiff's gender dysphoria ("GD") disability, Plaintiff sought to be treated consistent with their gender identity, to be referred to with the preferred pronouns "they," "them," and "theirs," and access a restroom that was not a male restroom which request was not addressed.

203.   The male restroom on the floor of Plaintiff's office building was used by Plaintiff's male colleagues, and also the Plaintiff's own male students.  The experience was humiliating when Plaintiff was required to use the male restroom.  Plaintiff wanted to use a restroom that was consistent with their gender identity.

204.   Plaintiff submitted a formal request alerting Defendant to discrimination, attached hereto as Exhibit "A," and, within it, Plaintiff identified that they felt uncomfortable using a male restroom.  Plaintiff identified to Carmen Mendoza, a representative of Defendant's Affirmative Action Office, that there were, Plaintiff believed, one or two Americans with Disabilities Act ("ADA"), or disabled, bathrooms.  See Formal Request, E-mail

Correspondence dated September 27, 2019, attached hereto as Exhibit "A." Plaintiff stated, *inter alia*: "I am trapped with the time in every day spent trying to arrive at work as my authentic self, combined with the systemic fear of abuse as I am required to enter the male bathrooms in every EMS [Earth and Mineral Sciences] building (no gender neutral bathrooms, only 1-2 ADA [Americans with Disabilities Act] bathrooms)." <u>See</u> Plaintiff's Formal Request, E-mail Correspondence dated September 27, 2019, at Ex. "A," p. 2. Plaintiff identified themselves in the e-mail as a "trans person." <u>See id.</u> There was no specific response to the restroom issue in writing or verbally by Ms. Mendoza or any other representative of the Affirmative Action Office.

205. Another colleague happened to tell Plaintiff about the existence of ADA restrooms, and not any representative of Defendant's Affirmative Action Office, not any member of Defendant's upper management, not a supervisor, and not an employee of the HR department.

206. Plaintiff discovered or became aware on their own of <u>one</u> ADA restroom.

207. This restroom was not even in Plaintiff's building.

208. Plaintiff had to leave their office, leave their floor, leave their building, and traverse campus in order to use the restroom.

209. Ms. Mendoza and the Defendant provided no specific response to Plaintiff's concern about access to the restroom.

210. Ms. Mendoza did state in response to one of Plaintiff's prior e-mails: "Dear Frey, My heart breaks reading what you're experiencing.  I can understand how that makes you feel.  It is a systemic situation.  What is the solution???" See E-mail Correspondence from Carmen Mendoza, Affirmative Action Office, to Plaintiff, dated September 25, 2019, at Ex. "A," p. 6.

211. Defendant did not act to prevent, correct, or remedy the issue Plaintiff raised regarding restroom access.

212. Neither did Defendant engage in the interactive process to identify an available reasonable accommodation.

213. Defendant had knowledge of Plaintiff's transgender-related disability.

214. Defendant failed to accommodate Plaintiff's transgender-related disability.

215. Plaintiff identified, in or around 2018, in a "Self-Assessment" document, which Defendant asks its employees to provide, and which Plaintiff did provide to Defendant, stating:

> I self-identify as [a] non-binary person and I work in solar energy, in a sub-field that I created called *solar ecology*.  For clarification, being nonbinary, or genderqueer, is a less well know[n] form of transgender self-identification.  Used today, *transgender* is also an umbrella term to indicate not identifying with the gender assigned to you at birth.  I have

> never identified as cis-male (assigned male at birth), and neither do I
> identify as a woman.  As a result, in STEM environments of work, I
> often experience a social dysphoria and fear of revealing my identity.
> Every day at Penn State until late 2018 had been an energy intensive
> effort to mask my presentation of self, to present[,] in essence, in 'drag'
> as straight, masculine, cis-male.  I believe my 2019 transition to identify
> openly as a transgender non-binary person and as [a] queer solar expert
> was essential to effect profound change for my professional future.

See Plaintiff's Self-Assessment, dated 2018, p. 1.  Plaintiff's Self-Assessment also

supplies Defendant with knowledge of Plaintiff's disability.  Plaintiff's Self-

Assessment is a document that is integral to and explicitly relied upon in the

Complaint.

216.   Plaintiff was also known as being "genderqueer" by various employees to

whom Plaintiff told this.

217.   Plaintiff met formally with Lee Kump, Dean of the College of Earth and

Mineral Sciences, on or about January 16, 2019.  During the meeting,

Plaintiff took notes of the discussion.  Plaintiff wrote, among other things, "

– not realizing I do not identify as a man. [genderqueer]."  Plaintiff

discussed with Dean Kump during the meeting that Plaintiff identified as

"genderqueer."  See Plaintiff's Meeting Notes, dated January 16, 2019, at p.

1.  Plaintiff's meeting notes from this date consist of a two-page document

that was integral and explicitly relied upon in the Complaint.

218.   Plaintiff was pervasively misgendered which occurred during their

employment because the Plaintiff is non-binary and transgender.  This occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

219.  Plaintiff was frequently misgendered for example, by their supervisor/manager, Dr. Sarma Pisupati, with incorrect pronouns ("he," "him," and "his").  This occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

220.  In addition to Plaintiff's supervisor/manager, Dr. Pisupati, frequently misgendering Plaintiff, Russell Johns frequently misgendered Plaintiff including with incorrect pronouns.  Russell Johns is the George E. Trimble Chair of Energy and Mineral Sciences, was also on the Plaintiff's Tenure Review Committee, and was involved in the decision-making to deny the Plaintiff tenure.  The misgendering by Russell Johns occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

221.  In addition to Plaintiff's supervisor/manager, Dr. Pisupati, and Russell

Johns, Chair of the Department and of the Tenure Review Committee, frequently misgendering Plaintiff, Plaintiff was also frequently misgendered during their employment, with incorrect pronouns, by:  Jonathan Mathews, Professor, who acted as the supervisor/manager in lieu of Dr. Pisupati for a period of time; Chunshan Song, Director of the Energy Institute; Turgay Ertekin, Professor Emeritus, who acted as the Department Head for a period of time; Ljubisa Radovic, Professor of Energy and Mineral Engineering; and Andy Kleit, Professor of Energy and Environmental Economics.  Plaintiff was misgendered despite identifying that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

222.  Dr. Pisupati also regularly used comments that were not consistent with Plaintiff's gender identity, such as "guy" and "young man," to refer to Plaintiff, in Plaintiff's presence, and also in the presence of other employees. This also occurred after Plaintiff identified that they wanted to be treated consistent with their gender identity including by being referred to with the pronouns, "they," "them," and "theirs."

223.  Plaintiff eventually indicated to Dr. Pisupati that Plaintiff wanted to be called "Frey" which is a gender-neutral form of the male name, "Jeffrey."

Dr. Pisupati conspicuously avoided using the Plaintiff's first name entirely, Plaintiff contends, because the Plaintiff is non-binary and transgender.

224. The supervisor/manager, Dr. Pisupati, called other male employees by their first names.

225. The supervisor/manager, Dr. Pisupati, actively avoided the Plaintiff, and not the cisgender male employees in the office.  This made it more difficult for the Plaintiff to do the job because being able to interact or communicate with one's supervisor including to receive direction is an essential function of the job, and constitutes control with respect to the employment relationship, to which all of the other employees under Dr. Pisupati were subject.  Dr. Pisupati actively avoided Plaintiff because Plaintiff is transgender and non-binary, electing to interact with the Plaintiff, and to address the Plaintiff, on rare occasions, if at all.

226. When it appeared Dr. Pisupati was being required to interact with the Plaintiff, which was rare, Dr. Pisupati addressed the Plaintiff overly formally, with "Dr. Brownson," or "Doctor," in order to avoid using the Plaintiff's preferred first name, "Frey"—which is different than how Dr. Pisupati referred to and treated the cisgender male employees in the office whom he referred to by their first names, and with Plaintiff's further requests

to be treated consistent with their gender identity not honored by Dr.

Pisupati.

227.   Dr. Brownson's GD was a motivating factor in Penn State's termination.

228.   Penn State acted with deliberate indifference to Dr. Brownson's rights.

229.   As a direct result of the aforesaid unlawful discriminatory practices engaged

in by Penn State, Dr. Brownson has sustained harm.

230.   As a further direct result of the aforesaid unlawful discriminatory practices

engaged in by Penn State, Dr. Brownson has suffered severe emotional

distress,embarrassment, humiliation, and loss of self-esteem.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Dr. Brownson respectfully requests that this Court:

A.   Award Dr. Brownson compensatory and punitive damages, attorneys'

fees, costs, and disbursements.

B.   Award Dr. Brownson such other and further relief as the Court may

deem just and proper.

A trial by jury is demanded on all counts.

Respectfully submitted,

FREUNDLICH & LITTMAN, LLC

DATED: <u>04/29/2022</u>     BY:   <u>*/s/ Justin F. Robinette, Esquire*</u>
Austin R. Freundlich, Esquire (I.D. # 205670)
Gregory C. Littman, Esquire (I.D. # 306806)
Justin F. Robinette, Esquire (I.D. # 319829)

Freundlich & Littman, LLC
1425 Walnut Street, Suite 200
Philadelphia, PA 19102
(215) 545-8500
<u>justin@fandllaw.com</u>

*Attorneys for Plaintiff*

# EXHIBIT "A"

Formal Request (Oct 8, 2019)

---

From: Borges, Carmen Bonilla <cbb1@psu.edu>

Sent: Friday, September 27, 2019, 17:01

To: Brownson, Jeffrey

Subject: RE: Checking in Sept 18, 2019

Frey,

I will follow-up with the dean on the salary review issues. But I can tell you that your salary will not be compare with the salary of the tenured associate professors because those salaries include the percentage increase they received when tenure was granted. What do you mean by "the dean and administration extracted 2 of my years during the tenure track process"?

Who made you the offer to move into Walker? Your students? Is that the basement you mentioned you could move into that could use some refurbishing?

And Frey, please tell your trans peers and others who share their complaints with you that they should submit a complaint themselves.

Take care!

Carmen

From: Brownson, Jeffrey <jrb52@psu.edu>

Sent: Friday, September 27, 2019 1:46 PM

To: Borges, Carmen Bonilla <cbb1@psu.edu>

Subject: Re: Checking in Sept 18, 2019

Formal Request (Oct 8, 2019)

Dear Carmen,

So far the Dean has not confirmed any of actions 2-4 that you list since you met with him on Sept 6. It is now 21 days later. Three weeks to even email me about checking my pay against my EME associate professor level peers?

I heard from my Dept head on the office/lab space last Friday, as Sanjay speaks directly with Lee (14 days after you spoke). The word was that the Dean will not commit to offering me and my 22+ students safe space. I did get an offer to move myself into Walker, always from my students working in "the dungeon". This is the same action as last January.

The reason for a formal complaint and a grievance now seems quite appropriate and neccessary, specifically because Dean Kump and the administration has extracted 2 of my years during the tenure track process, while i have been required to spending any of my spare time documenting and reporting to EMS HR and our ombudsperson, and anyone else.

I am trapped with the time in every day spent trying to arrive at work as my authentic self, combined with the systemic fear of abuse as I am required to enter the male bathrooms in every EMS building (no gender neutral bathrooms, only 1-2 ADA bathrooms). I need fo walk through hall walls of EMS and act as if I am OK when my colleague this Wed greeted me as "Jeff", and having no power to counter it (12 years of asking to be called Jeffrey and to have it spelled correctly if used). I have to be triggered with PTSD every time I enter that horrible, asbestos filled building basement with no daylight, where my students occupy a lab meant for 5 (22+ people). I have to engage in weekly therapy using CBT to just accept the persistent trauma of life in EMS. That time trying to figure out survival while trapped and excluded and ignored now consumes over 50% of my work day.

I need your help (anybody's help!) as a trans person who has trans peers that are talking about hurting themselves due to the environment of EMS. I went to the intervention training on Thursday for Geography and Geology, and you know who showed up? Students, staff, postdocs, and fixed term faculty. You know who did not? Tenured faculty and our Dean Kump, who is specifically a member of Geology faculty. These are our physical signals that there will be no change for those in power.

5

Formal Request (Oct 8, 2019)

I feel strongly that this is academic abuse. The deflections by those in power continue to strip me of my humanity. This is "like putting a band-aid on gangrene" (a quote from a fellow queer STEM and STS scholar).

I am so thankful for your support and time in these busy days. Thank you. 🙏 Please forgive my extended notes. My frustration is in no way directed toward you and your skillful methods. It just seems like I am throwing words into the void after 12 years.

Warmly,

Frey

pronouns: they/them/their

 ---

From: Borges, Carmen Bonilla <cbb1@psu.edu>

Sent: Friday, September 27, 2019 10:37:42 AM

To: Brownson, Jeffrey <jrb52@psu.edu>

Subject: RE: Checking in Sept 18, 2019

Frey,

I have been working on addressing some of the specific concerns you expressed when we met in the Affirmative Action Office on September 5, 2019. The next day, September 6th, I met with the dean, Lee Kump, and discussed the follow specific concerns:

(1) The advice given to the student by Prof Mathew. The dean was aware of this and was going to take corrective action.

(2) Your salary inequity concern. The dean offered to look into it by making a salary comparison.

Formal Request (Oct 8, 2019)

(3) Your office space concern. The dean was going to follow-up on this.

(4) The broader climate issues are going to be address in educational programing to all faculty in the department. The dean and the department head are in full support of this and they are in conversations with the professional development coordinator from the Affirmative Action Office for the development and delivery of the program.

Let's plan to meet again sometime next week. Let me know your availability.

With regards,

Carmen

 ---

From: Brownson, Jeffrey <jrb52@psu.edu>

Sent: Thursday, September 26, 2019 3:41 PM

To: Borges, Carmen Bonilla <cbb1@psu.edu>

Subject: Re: Checking in Sept 18, 2019

Dear Carmen,

I would be interested in this being a formal investigation. This is what I thought was happening, and thus the sharing, but I was mistaken after attending and learning from today's bystander intervention training.

All of my documented materials have been shared and shared again, from Dept, to College HR, to two Deans of EMS, to ombudsperson, to EMS faculty senate representatives Erica Smithwick (former) and Brian King, to the Sustainability Institute, to The VP of Faculty Affairs and Equity, and now to Affirmative Action, with you Carmen.

Formal Request (Oct 8, 2019)

The fact that nobody in that long list felt empowered to act on my behalf and effect change, or to address a truth and reconciliation for unequal pay for energy engineering work over 12 years...it's really stunning. I have shared that I feel as a ghost that haunts EMS, after being sufficiently squashed out of the community and with no escape to go to.

I would like to better understand if, and how, I can file a grievance after 12 years and hundreds (or thousands) of aggressions, demeaning jokes, misnaming, and identity erasures.

Unfortunately, and more important to community care, we have a new trans faculty in EMS who is already feeling the crushing weight and the sense of haunting the College, while being used for your quirky character and charm with students. This is only four months into their job and they stated to me that the College experience is traumatic, and yet they are also trapped.

If I need to be that trailblazer for her to not harm herself, then please, scrutinize everything. There is no more time for me to wait.

Sincerely, and in solidarity with all those marginalized.

Dr. Frey Brownson 🌈

...the only queer solar scientist and artist haunting Penn State ✊🏾

"Washing one's hands of the conflict between the powerful and the powerless means to side with the powerful, not to be neutral. " — Paulo Freire

---

From: Borges, Carmen Bonilla <cbb1@psu.edu>

Sent: Wednesday, September 25, 2019 9:08:29 PM

To: Brownson, Jeffrey <jrb52@psu.edu>

Subject: Re: Checking in Sept 18, 2019

Formal Request (Oct 8, 2019)


Dear Frey,

My heart breaks reading what you're experiencing. I can understand how that makes you feel. It is a systemic situation. What is the solution???

Carmen

Sent from my iPhone

---

On Sep 25, 2019, at 7:08 PM, Brownson, Jeffrey <jrb52@psu.edu> wrote:

Dear Carmen,

This Wed, the 25th I attended our Fall EME faculty meeting. It was challenging, and I was there to listen. I arrived early, I was not disruptive, and did not say anything to disturb the men. The atmosphere was oppressive and grim. With the exceptions of Seth and Sanjay who were both supportive, my experience was entirely isolating and cold.

When you think of the need to act to reduce our carbon impact from Friday's UN protests, the imperative to bring on diverse communities of race, gender, and class in decarbonizing our farms and cities, it is completely alien to sit for an hour hearing people plan to do more for the fossil fuel industry. The only recruiting mentioned for students was for fossil fuel firms. Really.

There was no mention of any of our work with the solar farm, or the ground breaking with the Governor. Maybe that is for the best. This group will always be a coal, oil, gas, and fuel community, and the labs in Hosler will always be occupied for these fossil fuels teams and the geosciences to support that identity. Our Solar Collaborative will work in our aptly-labeled lab (by the students), "the dungeon" in the basement with the cockroaches.

I have no expectations of change to solar peership across the College after hearing this meeting. This cohort (who attended the EME meeting) shows no intention of reducing any fossil fuel research, let alone hiring new people who are actively working to replace fossil

Formal Request (Oct 8, 2019)

fuels like as myself. Hiring committees have no dedicated renewable energy representatives. There are conflicts of interest on their part to hire anti-fossil fuel scholars, and there seems to be very little direction or sanctioning from Dean Kump. Again this is a systems problem.

My surprise was how much today's meeting sounded exactly like the first meetings that I attended in 2007. I felt today what I felt in 2007, fear. Only my feeling of fear is made more intense after coming out as trans, and losing my ability to mask my interests, my sincerity to work to remove carbon from our industries, and my authentic queer artist identity in a masculine man-performance of engineering exceptionalism.

I feel that I can only be permitted to work in EME if I am made to be disempowered as a joke by colleagues (I am often the but of the joke in meetings from 'friends' who research coal or coal combustion, and there was the faculty interview...). I feel I can only be permitted to work in EME if I am excluded by presenting my working in solar energy as extremist ("Solar, solar, solar. Jeff is always only talking about solar energy" stated often by Sarma Pisupati in past years). I can survive, because we must have a paycheck and are trapped here, but only as long as I am not my authentic self at work.

I remain scared and isolated. I remain exhausted trying to squeeze a place for myself into this Dept., and each week has gotten harder while trying to fit in, not more tolerable.

I will attend the bystander intervention training tomorrow at lunch, and hope that event is less oppressive than today.

Thank you for your patience with these long notes documenting my experiences. I write them to try to convey my valid feelings of oppression, and never feeling safe to be my authentic self at work, and spending my down time at home healing from the daily experiences grinding me down to feeling less than human.

Sincerely,

Frey

"The production of the new can't be located and it certainly can't be owned. Neither the past nor the future is ever closed." — Karen Barad

Formal Request (Oct 8, 2019)


---

From: Brownson, Jeffrey

Sent: Monday, September 23, 2019 5:23:22 PM

To: Borges, Carmen Bonilla <cbb1@psu.edu>

Subject: Re: Checking in Sept 18, 2019

Dear Carmen,

I look forward to meeting with you this week.

Thank you for inquiring on my behalf. No changes from the Dean this far. No responses to my emails seeking change that you have been cc'd on either.

My letter from the Dean arrived regarding pay (shared in confidence), and the change in pay looks quite close to the rate of inflation. I just helped to launch an enormous solar farm with a $14 million savings in the Penn State budget, and I am adjusted in pay with inflation? I would like to ask if there is any progress on being paid less than my Associate Prof peers in EMS engineering?

My stress level is really high, and I am expected to attend a faculty meeting this Wednesday. Therapy, meditation, running, good eating, and zoloft can only go so far. I am exhausted and scared of my workplace.

Frey

---

From: Borges, Carmen Bonilla <cbb1@psu.edu>

Sent: Wednesday, September 18, 2019 2:16:48 PM

Formal Request (Oct 8, 2019)

To: Brownson, Jeffrey <jrb52@psu.edu>

Subject: RE: Checking in Sept 18, 2019

Frey,

I spoke to the dean again regarding your office space and he was going to be in touch with you to discuss it. Conversations are going on with Sanjay regarding the educational program for the department. I'll be in touch with you next week to schedule a time for us to meet again.

Regards,

Carmen

---

From: Brownson, Jeffrey <jrb52@psu.edu>

Sent: Wednesday, September 18, 2019 11:36 AM

To: Borges, Carmen Bonilla <cbb1@psu.edu>

Subject: Checking in Sept 18, 2019

Dear Carmen,

I am sharing some additional paperwork and inquiring if more progress been made regarding my work in EMS? I understand there are likely more important cases of abuse, and your time is limited, please forgive the intrusion. I just don't get much of any feedback from my Dean regarding the systemic and intersectional problems that we have talked about.

Please note that I just had a personal conversation yesterday with another trans person in EMS who is also just overwhelmed by their inability to function in the EMS culture of silent

Formal Request (Oct 8, 2019)

rules and unspoken norms. Again we are talking about potential for a departure coming in less than a year.

Also, my last ally of a similar age, whom I collaborate with in papers and advising, Seth Blumsack, is now being transferred out of EME and up to a Director position. Sanjay alone remains in that Dept as an ally.

I would like for something to happen for me and my Collaborative of 22+ students, but I must remain for the last year if tenure evaluations inside of EME. This is all so distressing.

Sending two files that should be read together...

1. the Update page that is likely in your records, following denial of die process. Includes pay estimate in late 2018.

https://drive.google.com/file/d/0B988GJZDPBnY2tXeE9vbzNfR0ZneWJ0TTBROE95RTBHb1RZ/view?usp=drivesdk

2. The Workload analysis presented to Prof. Srinivasan in early 2018 describing conditions for work overload to accomplish adequate pay to live in State College (2 person income family). Starting wage in 2007 was well below today's salary, only achieved by taking on extra work.

https://drive.google.com/file/d/17CgKBAsc-9546AZUCCiSBzS89SabnrQE/view?usp=drivesdk

Thank you for your time and support.

Sincerely worried about the rest of the academic year.

In solidarity.

Frey

Jeffrey R. S. Brownson, Pronouns: they/them

## <u>CERTIFICATE OF SERVICE</u>

I, <u>JUSTIN F. ROBINETTE, ESQUIRE</u>, hereby certify that on this <u>29th</u> day

of <u>APRIL</u>, <u>2022</u>, the foregoing document was filed and served on all counsel of

record via the Court's electronic filing system.


Respectfully submitted,

FREUNDLICH & LITTMAN, LLC

DATED: <u>04/29/2022</u>     BY:     <u>*/s/ Justin F. Robinette, Esquire*</u>
Austin R. Freundlich, Esquire (I.D. # 205670)
Gregory C. Littman, Esquire (I.D. # 306806)
Justin F. Robinette, Esquire (I.D. # 319829)

Freundlich & Littman, LLC
1425 Walnut Street, Suite 200
Philadelphia, PA 19102
(215) 545-8500

*Attorneys for Plaintiff*